UNITED STATES of America,
Plaintiff–Appellee,

v.

Brian T. ELLZEY,
Defendant–Appellant.

No. 90–2085.

United States Court of Appeals,
Tenth Circuit.

June 24, 1991.

Peter Schoenburg, Asst. Federal Public Defender, Albuquerque, N.M., for defendant-appellant.

Robert J. Gorence, Asst. U.S. Atty. (William L. Lutz, U.S. Atty., with him on the brief), Albuquerque, N.M., for plaintiff-appellee.

Before SEYMOUR, ANDERSON, and TACHA, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Brian T. Ellzey appeals his conviction in district court for interference with interstate commerce by threats of violence in violation of 18 U.S.C. §§ 1951 and 2. He contends that: (1) the trial court's prohibition of his cross-examination of a government witness to show bias denied him his right to confrontation; (2) the prosecutor's remarks during closing argument constituted prosecutorial misconduct sufficiently prejudicial to justify the granting of a new trial; and, (3) the trial court's submission of an *Allen* instruction coerced the jury into a guilty verdict. We affirm.

## BACKGROUND

Brian Ellzey was charged with extorting $50,000 from the Moriarty branch of the United New Mexico Bank. The facts are as follows: On January 11, 1989, John Griego, an Assistant Vice–President and Branch Manager of the bank, arrived at the bank at his usual time of 7:45 a.m. Upon entering the building, Griego found a note

telling him of the location of a bomb in the bank and informed him that a similar bomb was located at his home with his wife and daughter. The note warned that the bombs would be activated either by the lifting of a phone receiver or by transmitter signals from police radios within fifty feet or by the triggering of remote transmitters in the possession of the extortionists who "will monitor every action you take." The note then instructed Griego to wait in the storeroom until the bank vault's time lock expired at 8:00 a.m. at which time he was to place $50,000 in small, unmarked bills in a box, along with the instructions and the bomb.

Griego complied with the instructions except he left the storeroom at 7:55 to retrieve the newspaper from the front of the bank and photocopied the instructions to prove that he had, in fact, been extorted. He filled the order entirely with $20 bills. Griego then drove to Old Cemetery Road and left the box behind the ninth power pole as instructed.

Thomas Brown lived a half-mile from the drop-site and witnessed both the drop and the pick-up. While walking to work along Cemetery Road, Brown saw a dark pick-up truck stop, the driver get out and leave a box behind the power pole. Soon thereafter, Brown saw a maroon car stop, the driver get out and retrieve the box. Later that day, Brown described the second car to police authorities as a two-door, maroon Chevy Citation hatchback with a six-inch racing stripe and a white sticker on the windshield. He later identified a photograph of Ellzey's car as the same car even though his car was a red four-door Datsun without sticker or racing stripe, although it had a bumper guard.

New Mexico State police officer Mark Clayton and a fellow officer were the first to arrive at the drop-off scene a few minutes after 8:30. Clayton testified that there were two sets of footprints going from the roadway directly east to the pole. One set was made by cowboy boots, the other by boots with a corrugated vibrum sole, like the kind worn by the police. Clayton denied that he had made the sec-

ond set of prints. He saw no other tracks leading up to the pole from any direction. About 9:00 a.m., Sheriff Gary Watts arrived. He found tennis shoe tracks some distance south of the pole that led to Brown's house and then returned along the road and passed several feet west of the pole.

At trial, Elizabeth Campbell, the grandmother of Ellzey's wife, took the stand. Ellzey and his wife had lived with Campbell for a number of years. She testified that while Ellzey usually got up at 9 o'clock, on January 11th he was gone from the house by 5:30 a.m. He returned for lunch wearing basketball shoes. She testified, however, that he did own work boots, presumably of a type that would leave a print similar to those found at the pole.

Two other prosecution witnesses, Kelly Bicknell, the cousin of Ellzey's wife, and Leslie, his wife, both testified that Ellzey had picked them up after work on June 2. They stated that Ellzey and Kelly got drunk and that Ellzey told them that he had extorted the Bank, but that he only received $10,000 and his father had kept the rest. Ellzey also purportedly stated that he was not afraid of getting caught because he had nothing left to show for his ill-gotten gains and because he trusted them not to tell anyone.

The government then showed the financial status of Ellzey before and after the date of the extortion as circumstantial evidence of his involvement. Prior to the extortion, Ellzey had $5,000 in outstanding debt, lived rent-free with relatives and his wife had been receiving public assistance. In December, he and his wife applied for an FHA loan to purchase a house, indicating in their application that they had $200 in cash and that they anticipated that Ellzey would earn $13,800 in 1989.

After the extortion, the government presented evidence that Ellzey became notably more affluent than before and spent approximately $6,300 within a few months. For example, on January 15, he bought a 1978 Oldsmobile for $1,100, entirely in $20 bills. Then, he and his family drove to California for a week long vacation visiting

relatives. Ellzey also paid $318.75 in cash to finish payments on a gun. Then in February, Ellzey rented a home for his family, making the payments almost totally in $20 bills. In addition, he paid $220 in cash to start utility services and posted $1,200 worth of bonds in Bernalillo County Metropolitan Court, paid in $20 bills. Campbell testified that Ellzey also bought a big screen TV, a VCR, a Nintendo game and several Nintendo tapes. When Ellzey's car was searched on May 10, 1989, nineteen $20 bills were found in the glove compartment.

The defense sought to establish reasonable doubt as to Ellzey's guilt by showing that Griego concocted the extortion hoax and had carried it out with Brown's help. Ellzey attempted to show that Griego had become disenchanted with his work and had a personality conflict with his supervisor. He also relied on Griego's preoccupation with preserving evidence of extortion, on Griego's minor departures from the instructions indicating that he did not fear that he or his family would actually be harmed, and on the fact that Brown had failed to tell the police that he had seen Griego drop off the box and had inaccurately described Ellzey's car. He also showed that Brown was in financial trouble at the time of the extortion.

Ellzey claimed that he had been in Estancia, New Mexico on the day of the extortion. He and his wife testified that Ellzey left the house about 8:50 a.m. on the day in question and went to Estancia as usual to call his father to see if there was work for him that day. He also testified that he began earning more money than he had ever earned before in late 1988 and early 1989 and that he saved as much as he could, much in $20 bills, to better his family situation. He denied confessing to the Bicknells.

The jury returned a verdict of guilty from which Ellzey now appeals.

## CONFRONTATION CLAUSE

■ Ellzey argues that the district court violated his right to confrontation by restricting his cross-examination of Gary Watts, a government witness, concerning a pending state felony indictment against him. After reviewing de novo, we disagree. *See Tapia v. Tansy,* 926 F.2d 1554, 1557 (10th Cir.1990) (review Confrontation Clause claims de novo, citing *Haggins v. Warden, Fort Pillow State Farm,* 715 F.2d 1050, 1055 (6th Cir.1983), *cert. denied,* 464 U.S. 1071, 104 S.Ct. 980, 79 L.Ed.2d 217 (1984)).

At the time of his testimony, Gary Watts, sheriff of Torrance County, was under indictment in Bernalillo County for residential burglary, larceny and conspiracy, facing a maximum sentence of eight years imprisonment. One of the prosecutors for that case, Mark Jarmie, had worked in the United States Attorney's Office with Robert Gorence, the assistant U.S. attorney prosecuting this case, up until one year before trial. Ellzey sought to cross-examine Watts about his state charges in order to establish a "prototypical form of bias" for the prosecution. He argues that "[i]t would not be unreasonable [for the jury] to surmise Watts would feel that, by impressing with his helpfulness the recent colleagues of the person prosecuting him, he would increase his chances for favorable treatment by the prosecutor in his criminal case." Appellant's Brief at 30–31.

The district court prohibited questioning on the subject for the following reasons:

Firstly, there is absolutely no testimony in this proffer from which a jury could infer that there is any suggestion that he might receive any favorable consideration by anyone connected with this case in reference to the charges in exchange for favorable testimony to the government.

As a matter of fact, and so far as the testimony is concerned, the testimony, all that it does is it buttresses other testimony to the same effect.... So that there is no suggestion at all that this witness is doctoring his testimony in any way whatsoever.

And if relevant by any stretch of the imagination, if the matter of the state indictment against him is relevant by any

stretch of the imagination, I would exclude it on 403 grounds, on the grounds that the probative value of that testimony, the testimony concerning the state charges, is greatly outweighed by the possible prejudice to the state, to the government, and also by a confusion of the issues.

Tr. at 372–73.

■ The Confrontation Clause guarantees the right to effective cross-examination. *Tapia v. Tansy*, 926 F.2d at 1557. However, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *see United States v. Anderson*, 881 F.2d 1128, 1138 (D.C.Cir.1989) ("The basic … factors affecting admissibility[ ] must of course still be met with regard to evidence of bias."). A constitutional violation occurs only when the defendant is prohibited from engaging in "otherwise appropriate cross-examination" and thereby prevented from exposing facts from which jurors "could appropriately draw inferences relating to the reliability of the witness." *Delaware v. Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436 (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)). The cross-examination sought by Ellzey in this case did not sufficiently connect the pending state charges against Watts to his testimony in the present federal case and, thus, there was no "appropriate inference" of a "prototypical" form of bias to be drawn. Correspondingly, the limit on his cross-examination did not violate his right to confrontation.

Ellzey argues that, to prove bias, there need not be an actual agreement between the prosecution and the witness exchanging testimony for favorable treatment of pending charges. Rather, he contends that the witness's belief that he may be benefited, even if objectively unreasonable, shows bias. However, not only does nothing in the proffer suggest that Watts held such a subjective belief, the evidence directly contradicts such a finding. Watts testified in voir dire that he had not engaged in any plea agreements, that the United States attorneys had nothing to do with dropping some of his charges a month earlier and that he had only spoken to the federal prosecutor on the morning he testified and the FBI investigators on the afternoon before. He also denied any knowledge that Jarmie had worked in the U.S. Attorney's Office with Gorence. Tr. at 371. Furthermore, since Watts's testimony was consistent with his report at the time of the investigation, there is no indication that he altered his story in favor of the prosecution. *Id.*

Ellzey also contends that the pending indictment alone is sufficient to establish bias, citing to *Stevens v. Bordenkircher*, 746 F.2d 342 (6th Cir.1984), *United States v. Anderson*, 881 F.2d 1128 (D.C.Cir.1989), and *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). However, these cases are easily distinguished from the one before us since, in addition to the indictment itself, there was a clearly established connection between the witness's testimony and the prosecution against him. In *Bordenkircher*, the witness had asked for leniency from El Paso authorities in return for his cooperation in the Kentucky trial at which he testified. In both *Anderson* and *Davis*, the prosecution had direct authority and influence over the charges against the witness. In *Davis*, the witness was on probation and, thus, was vulnerable to undue pressure to testify favorably to the prosecution out of fear of probation revocation. Similarly, in *Anderson*, the prosecution had dismissed, without prejudice, a murder indictment against the witness. The court held that "the *prosecution's ability* to reinstate the indictment gave the witness a motive for favoring the prosecution." *United States v. Anderson*, 881 F.2d at 1138 (emphasis added). No such authority or ability rested with the federal prosecution in this case. Ellzey has shown only the existence of an indictment in another jurisdiction being

prosecuted under separate prosecuting authority. Under these circumstances, the indictment alone does not establish the direct link between the witness's testimony and potential reward or retribution by the charging prosecution evident in the cited cases.

Furthermore, given the remote and tenuous link between the state charge and federal testimony, we find that the district court did not abuse its discretion in excluding the questioning under Federal Rule of Evidence 403.

■ Even if the district court's prohibition of the cross-examination violated the Confrontation Clause, we find that it was harmless error beyond a reasonable doubt. The factors bearing on the effect of the excluded testimony include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *United States v. Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438.

Watts's testimony was not critical to the government's case-in-chief. Rather, the prosecution's case was firmly grounded in the other evidence presented—Ellzey's confession to a relative, his prolific use of $20 bills in purchasing a number of luxury items, paying rent on his newly rented home and going on vacation, Campbell's testimony that Ellzey left the house at 5:30 a.m. and the testimony of Brown regarding the pick-up and his subsequent identification of Ellzey's car. Watts was important to the prosecution only to rebut the defense's claim that Brown and Griego extorted the money. However, his testimony was not crucial for that purpose either. His testimony corroborated the testimony of Clayton that only two tracks led up to the pole and of Brown, who testified that he did not approach the pole. In addition, Watts's testimony that the bootprints at the pole differed from the boots Clayton was wearing was similarly corroborated by

Clayton's statement that he had secured the area and had not approached the pole.

Thus, we find that Ellzey's right to confrontation has not been violated.

## PROSECUTORIAL MISCONDUCT

■ Ellzey argues that the prosecutor made several improper comments during his closing argument, thereby depriving him of a fair trial and influencing the jury to convict on grounds beyond the admissible evidence presented at trial. We disagree.

Ellzey first contends that the following underlined excerpt from the prosecution's closing argument shifted the burden of proof to the defendant by framing the issue as though, to be acquitted, Ellzey must prove that Griego and Brown committed the crime. The statements occurred in the following context:

MR. GORENCE: [Y]ou heard Mr. Schoenburg say that he was going to prove this case, dissolve this case right before your eyes, and that in effect, his client, Mr. Ellzey, had been wrongfully accused and that in his words, this was a hoax perpetuated by Mr. Griego and Mr. Brown.

*Now, this promised to be a most interesting trial because I have been a federal prosecutor for over several years now, and I have never seen something like that accomplished in a courtroom.*

Tr. at 629 (emphasis added).

Since defense counsel did not object to that statement at the time of trial, we reverse only for plain error. *United States v. Lonedog*, 929 F.2d 568, 570 (10th Cir.1991). "Plain error is fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *Id.* (quoting *United States v. Henning*, 906 F.2d 1392, 1397 (10th Cir.1990)) (emphasis omitted). We do not find that the prosecutor's remark constituted plain error since the comment was isolated and mitigated by the numerous instructions given by the court on the government's burden to prove guilt beyond

a reasonable doubt, R. Tab 36, Instr. 3, 9, 17, 18, and the references by defense counsel in closing argument to that burden, Tr. at 661, 663–64.

Ellzey also argues that the statement improperly referred to evidence not in the record and constituted inappropriate expressions of personal belief. The prosecution did indeed introduce his perception that the proof of another's guilt is next to impossible, perhaps improperly implying that the jury should weigh that improbability in their decision. However, the remark did not amount to plain error.

■ Ellzey objected to the remainder of his claims of misconduct, so we use a two-step analysis in reviewing his claims.

> We must first determine whether the conduct was, in fact, improper. If the conduct was improper, we must then determine whether it warrants reversal. Prosecutorial misconduct does not warrant reversal if it was harmless error.... "A non-constitutional error is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." ... In determining whether the misconduct affected the outcome, we consider: "the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole."

*United States v. Lonedog,* 929 F.2d at 572 (citations omitted).

The prosecutor outlined the slim evidence presented by Ellzey to support his defense that Brown and Griego were the criminals and stated:

> MR. GORENCE: ... It's on that evidence that Mr. Schoenburg says that he solved this case.
>
> *Well, I submit to you there isn't a grand jury in this country that would indict someone on—*
> MR. SCHOENBURG: Your Honor, I am going to object. I think that is improper evidence.
> THE COURT: That is. Move off of that, please, Mr. Gorence.
> MR. GORENCE: Yes, Your Honor. Well, I will submit to you that that is not

evidence of anybody being involved in an extortion.

Tr. at 631.

We agree that the prosecutor improperly referred to evidence not in the record and that his statement constituted an inappropriate expression of personal belief. But we do not find that the comment affected the jury's verdict. Defense counsel objected in mid-sentence and the court immediately sustained the objection, thereby mitigating any prejudicial effect of the remark. Any residual prejudice was eviscerated by the court's later instructions that the jury "must consider only the evidence I have admitted in the case.... Remember that any statements, objections or arguments made by the lawyers are not evidence in the case.... What the lawyers say in (sic) not binding on you." R. Tab 36 Instr. No. 4; *see United States v. Lonedog,* 929 F.2d at 576 (assume juries follow instructions); *United States v. Williams,* 739 F.2d 297, 300 n. 4 (7th Cir.1984).

■ Ellzey also challenges the following statements, arguing that the prosecutor impermissibly asserted his personal belief of Ellzey's guilt, implicitly based on evidence within his knowledge although not admitted at trial. The prosecutor reviewed the evidence of Ellzey's guilt, beginning with Brown's testimony. He noted the discrepancies in Brown's description of the pick-up car and its driver and then stated:

> MR. GORENCE: But again, I submit to you that those aren't the critical differences.... I will agree with Mr. Schoenburg, and you will hear a lot about those discrepancies between the two and four door and the Datsun and the Chevy.
>
> *I would not be before you today asking you to find that man guilty if the sum and substance of the government's case against Mr. Ellzey was the testimony of Tommy Brown.*

Tr. at 634. He then related Campbell's testimony and again stated:

> There is no way that he left that morning at 8:30, because as I said again, *we wouldn't be here today if that was all the government's evidence.*

*Id.* at 635. At which point, defense counsel objected. The court admonished the prosecutor at the bench to "comment on the evidence" and to move on. *Id.*

Read in context, we find that a more reasonable interpretation of the comments than the one adopted by the defendant is that the prosecutor was emphasizing the amount of corroborating and supporting evidence that had been presented. This was not a case of a sole inconsistent or unsure witness. Rather there were a number of witnesses each adding a piece to the puzzle which, as a whole, created a picture of guilt beyond a reasonable doubt. The prosecution simply emphasized that point. Thus, we do not find that the prosecution acted inappropriately.

 Finally, Ellzey challenges the prosecutor's comment in rebuttal that "a good defense is a good offense. In other words, the last thing to talk about is [defense attorney's] client and more about other people." *Id.* at 666. Defense counsel objected because he claimed that the prosecution was "arguing the personal belief of defense counsel that somehow I believe my client is guilty, and I have to make a good defense." *Id.* at 666–67. His objection was overruled. The prosecutor was merely responding to the defense counsel's tactics and did not imply that by choosing an admittedly effective defensive technique, that defense counsel believed in the guilt of his client. Rather, the prosecutor simply drew the jury's focus back to Ellzey's participation in the crime.

Finally, Ellzey asserts that the cumulative effect of the prosecutor's comments deprived him of a fair trial and influenced the jury to convict on grounds beyond the evidence presented at trial. We disagree since it is unlikely that any of the alleged acts of prosecutorial misconduct, considered individually or cumulatively, affected the outcome of Ellzey's trial.

## *ALLEN* INSTRUCTION

Ellzey contends that the trial court coerced the jury into a guilty verdict by submitting an *Allen* [1] charge to them after

1. An *Allen* instruction derives its name from jury instructions approved by the Supreme Court in *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

The following instruction was given in this case:

Members of the jury, I do have your communication which appears that you may be deadlocked. But I am going to ask that you continue your deliberations in an effort to agree upon a verdict and dispose of this case and I now have a few additional remarks I would like for you to consider as you do so.

Members of the jury, this is an important case. The trial has been expensive in time, effort, and money to both the defense and the prosecution.

If you should fail to agree on a verdict, the case is left open and must be tried again. Obviously another trial would only serve to increase the cost to both sides and there is no reason to believe that the case can be tried again by either side better or more extensively than it has been tried before you.

Any future jury must be selected in the same manner and from the same sources you were chosen, and there is no reason to believe that the case could ever be submitted to 12 men and women more conscientious, more impartial, or more competent to decide it, or that more and clearer evidence could be produced.

If a substantial majority of your number are for a conviction, each dissenting juror ought to consider whether a doubt in his or her own mind is a reasonable one, since it appears to make no effective impression upon the minds of the others.

On the other hand, if a majority or even a lessor [sic] number of you are for acquittal, the other jurors ought seriously to ask themselves again, and most thoughtfully, whether they do not have a reason to doubt the correctness of a judgment which is not shared by several of their fellow jurors. And whether they should distrust the weight and sufficiency of the evidence which fails to convince several other jurors beyond a reasonable doubt.

Remember at all times that no juror is expected to yield a conscious conviction he or she may have as to the weight or effect of the evidence. But remember also that after full deliberations and consideration of the evidence in the case, it is your duty to agree upon a verdict if you can do so without surrendering your conscious conviction.

You must also remember that if the evidence in the case fails to establish guilt beyond a reasonable doubt, the accused should have your unanimous verdict of not guilty.

Now, you may be as leisurely in your deliberations as the case may require, and should take all the time you may feel is necessary. I will ask now that you retire once again and

the jury was deadlocked and that he is, therefore, entitled to a new trial. We disagree.

■ We review Ellzey's claim for plain error because we find that he failed to object with sufficient particularity at trial. Before the judge submitted the instruction to the jury, counsel for both sides examined the proposed instruction. Defense counsel then objected because the instruction "denie[d his] client's right to a verdict, unanimous verdict of 12 jurors." Tr. at 684–85. The court overruled the objection.

Rule 30 of the Federal Rules of Criminal Procedure requires that counsel must object to a proposed instruction, "stating distinctly the matter to which that party objects and the grounds of the objection" to preserve the objection on appeal. While we do not expect counsel to expound endlessly in great detail concerning the reasons for an objection, we do expect sufficient particularity to allow the trial court to rule adequately on the specific concerns.

At trial, Ellzey merely offered a general "coercion" objection to the *Allen* instruction. However, he asserts on appeal that his defense was "devastated," Appellant's Brief at 43, because of certain language in the instruction. Ellzey now specifically challenges the language in the instruction stating that "there is no reason to believe that the case can be tried again by either side better or more extensively than it has been tried before you" and that "there is no reason to believe ... that more and clearer evidence could be produced" at a second trial. He argues that the

> instructions flatly contradicted defense counsel's arguments in closing and the tenor of the defense case during the presentation of the evidence.... The underlying theme of Ellzey's case throughout the trial was that the government had overlooked at least two prime suspects and in doing so had not sufficiently investigated the case or preserved the evidence that was available. The prose-

cutor, on the other hand, argued that the government's agents had thoroughly investigated the case and had correctly determined that Ellzey assisted in the extortion.... By its *Allen* charge the trial court instructed the jury that the government was correct in [its claim that the prosecutor had thoroughly investigated the case] and that the defense theory was baseless, without any rational support. In this way, the court virtually directed a verdict for the government, improperly usurping the role of the jury.

Appellant's Brief at 42–43.

Had these specific concerns been raised at trial and the offensive language pointed out, the judge may have excised or edited the challenged portions. Similarly, if Ellzey's claim of "directed verdict" for the government had been specifically explained at trial, the judge would have been made aware that the application of the instruction to this case, because of the nature of the defense, was unduly coercive. But, the judge received no such guidance from counsel and indeed seemed to view this case no differently than others in which he had given the same instruction. *See* Tr. at 685. Since the trial court did not have an opportunity to rule on or remedy the concerns of defense counsel, we can reverse only if the giving of the instruction amounted to plain error.

■ Plain error is "error that 'affects the defendant's fundamental right to a fair and impartial trial.'" *United States v. Hernandez–Garcia,* 901 F.2d 875, 876 (10th Cir.) (quoting *Burroughs v. United States,* 365 F.2d 431 (10th Cir.1966)), *cert. denied,* —— U.S. ——, 111 S.Ct. 125, 112 L.Ed.2d 94 (1990). The instruction given in this case was nearly identical to that given in *United States v. Butler,* 904 F.2d 1482 (10th Cir.1990), and upheld by this court.

Ellzey attempts to distinguish *Butler* by emphasizing his particular defense tactics. Under these circumstances, the instruction may have impermissibly argued the

---

continue your deliberations, with those additional comments in mind, to be applied, of course, in conjunction with all of the instructions that I have previously given to you.

Tr. at 686–88.

government's case under the guise of judicial authority. However, even if it did, we do not find that it constituted plain error. Apparently, defense counsel, the one most involved and knowledgeable about his case and defense, did not notice the alleged "devastating" defect. We find it difficult to believe that a jury, unversed in the nuances of the law, would have viewed the instruction more carefully. In addition, upon looking at the instruction as a whole, we believe that the emphasis was on encouraging a verdict on the evidence presented rather than asserting which evidence to believe.

The remaining arguments made by defense counsel, while raising legitimate concerns about the dangers of giving *Allen* instructions, have been rejected by this court and others in reviewing similar instructions. We find no special circumstances in this case justifying a departure from these cases and, thus, similarly reject his arguments here.[2]

In accordance with the foregoing, we AFFIRM.

---

2. Ellzey argues, first, that the instruction was unduly coercive because the trial court erroneously instructed the minority of jurors to question their judgment. *United States v. Butler,* 904 F.2d at 1488; *United States v. Bonam,* 772 F.2d 1449, 1451 (9th Cir.1985). Second, he contends that the court erred in telling the jury that there would definitely be an expensive retrial if they did not reach a verdict. *United States v. Hernandez–Garcia,* 901 F.2d at 877; *United States v. Smith,* 857 F.2d 682, 684–85 (10th Cir.1988); *see United States v. Porter,* 881 F.2d 878, 887–88 (10th Cir.1989). And, finally, he argues that because the instruction was submitted after "lengthy deliberations" to a deadlocked jury, the instruction was particularly coercive and that

the jury's quick decision after the instruction further indicates they were coerced into a verdict. The jury here deliberated for 4½ hours before the *Allen* instruction was given. They then reached a verdict approximately 1½ hours later. *United States v. Butler,* 904 F.2d at 1487–88 (jury deliberated 9 hours before instruction and 2 hours after); *United States v. West,* 877 F.2d 281, 291 (4th Cir.1989) (2 hour deliberation after instruction is not evidence of coercive effect); *United States v. McKinney,* 822 F.2d 946 at 950 (10th Cir.1987) (jury deliberated 14 hours before instruction and 1½ hours after); *United States v. Bonam,* 772 F.2d at 1451 (1½ hours deliberation after instruction does not raise suspicion of coercion).