**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 11, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DONALD K. WEAVER and
VERDA WEAVER,

      Plaintiffs-Appellants and
      Cross-Appellees,

v.

RODNEY BLAKE, as next friend and
guardian of CHASE BLAKE, a minor,

      Defendant-Appellee and
      Cross-Appellant.

No. 03-1398
No. 03-1436

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 01-MK-1818 (PAC))**

---

Timothy Gill Buxton (James E. Puga and Timms R. Fowler, with him on the briefs), of Leventhal, Brown & Puga, P.C., Denver, Colorado, for Plaintiffs-Appellants and Cross-Appellees.

Wendelyn K. Walberg (Deana R. Dagner with her on the briefs), of Walberg, Dagner & Tucker, P.C., Denver, Colorado, for Defendant-Appellee and Cross-Appellant.

---

Before **KELLY** and **MURPHY**, Circuit Judges, and **ARMIJO**, District Judge.[*]

---

[*]The Honorable M. Christina Armijo, United States District Judge for the District of New Mexico, sitting by designation.

**ARMIJO**, District Judge.

This appeal arises from a motor-vehicle collision between Defendant Chase Blake (minor son of Defendant Rodney Blake) and Plaintiff Donald K. Weaver (spouse of Plaintiff Verda Weaver) as they drove in opposite directions on a dusty, unpaved farming road in Washington County, Colorado. Asserting jurisdiction under 28 U.S.C. § 1332 based on diversity of citizenship, Plaintiffs filed a civil action in the United States District Court for the District of Colorado alleging that the collision resulted from Defendant Chase Blake's negligence. At the conclusion of a five-day trial, a jury found that both drivers were equally at fault and awarded no damages. The district court entered judgment on the jury's verdict and denied Plaintiffs' motion for a new trial.

On appeal, Plaintiffs challenge the district court's decisions (1) to admit the testimony of a state police accident investigator concerning where he observed the vehicles' tire tracks at the accident scene, (2) to exclude evidence of Defendant Chase Blake's lack of a driver's license, (3) to decline to instruct the jury that Defendant Chase Blake's lack of a driver's license constituted negligence *per se*, (4) to place a limit on the length of time the jury was permitted to deliberate on a Friday evening, and (5) to accept a verdict form from the jury stating that each driver was 50% at fault and that Plaintiffs' damages were $0. In the event that the matter is remanded for a new trial, Defendants conditionally cross appeal the district court's decision to exclude expert testimony from an accident reconstructionist.

We have jurisdiction over Plaintiffs' appeal pursuant to 28 U.S.C. § 1291, and we affirm the judgment of the district court for the reasons set forth below. As we affirm the district court's judgment, we have no occasion to remand for a new trial and therefore dismiss Defendants' cross appeal as moot.

I.

We address the issues raised in Plaintiffs' appeal in roughly chronological order as they arose during the course of the litigation, starting with the contention that the district court erred in admitting certain testimony by Officer Dahlsten, a state police accident investigator who collected and recorded data from the scene of the collision. Before trial, Plaintiffs filed a motion *in limine* and the district court conducted a hearing to determine the admissibility of Officer Dahlsten's testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

At the conclusion of the hearing, the district court issued an oral ruling that: "Officer Dahlsten is qualified and may testify as an investigator who collects data at the scene of an accident for purposes of Rule 702, and he may express his opinion as to what he saw and measured as to the width of the roadway [and] the point of rest of the vehicles." The district court further stated that "[h]e can testify as to what he saw, where the skid marks were or where the tire marks were . . . ."

On these subjects, the district court noted that: "I have some question in my mind as to whether or not Officer Dahlsten's testimony, as I've circumscribed it, is really

-3-

expert testimony at all. It's fact testimony based on his observations at the scene." The district court further explained that:

> Officer Dahlsten is proffered and has been accepted not as an accident reconstructionist but instead as an accident investigator, which he defines as a person who collects data at the scene.
>
> Therefore, his sole purpose in this trial as an expert is to express an opinion within the scope of that role as an investigator: collecting data at the accident scene. Not any opinion as to what the data means, not any opinion as to the significance of the data, only what the data is.

Based on this reasoning, the district court also ruled before trial that Officer Dahlsten could not offer expert opinions based on technical analysis derived from the data or observations he collected concerning (1) the width of the road; (2) the point of impact; (3) the distance between the point of rest and the point of impact; and (4) which vehicle crossed over the midline of the road. In particular, the district court noted that: "Point of impact is not a fact. It is not data. It is an opinion." Similarly, the district court reasoned that "which vehicle crossed over the midline of the road . . . is not a fact and it is not data," because "[t]here was no sign in the middle of the road that says this is the midpoint."

The district court's oral rulings at the conclusion of the *Daubert* hearing were later summarized in courtroom minutes signed by the clerk of the court. In their brief on appeal, Plaintiffs refer to these courtroom minutes of the *Daubert* hearing as a "supplemental pretrial order."

At trial, Officer Dahlsten did not appear in the courtroom in person but offered live testimony from a remote location by means of a video connection. On direct examination, defense counsel elicited the following trial testimony concerning Officer Dahlsten's observation of tire tracks in the roadway where the two vehicles collided:

> Q. Can you describe where those tire tracks were and what you saw?
>
> A. When I arrived, I saw a set of tire tracks that based on my experience I could tell was a vehicle in control and traveling normally or in a normal fashion north up the county road, and I could see tire tracks that were coming south on the appropriate side of road that also indicated a vehicle that was in control that was operating normally.
>
> At a location, the two tracks met; and I could see then that was where the debris was. And then I could see what we call loss of control, where tracks from both vehicles immediately deviated from their path of travel and led to where the . . . two vehicles eventually came to rest.
>
> Q. With regard to the tracks that were traveling in a northbound direction, can you tell me more specifically the path that the northbound tracks took based on what you saw?
>
> A. Well, from what I remember, the tracks were driving--they're going north, except they're drifting, if you will or--what am I looking for--- they weren't staying right over on their half of the road. It's plainly obvious that the tire tracks went over the --what the middle of the road would be.

At this point in the testimony, Plaintiffs' counsel objected and moved for a mistrial on the grounds that Officer Dahlsten's testimony as to the location of the tire tracks in relation to the middle of the roadway exceeded the scope of what was permitted in the district court's pretrial ruling. During a bench conference, the district court overruled the objection and denied the motion for a mistrial, reasoning that: "Center line can mean

-5-

either two things:  either the precise center line, or his observed center line.  And you can explore that on cross-examination."

In light of the district court's ruling, Officer Dahlsten completed his answer to defense counsel's question as follows:

> The northbound tire tracks . . . were driving north on the right half of the roadway; and as they approached the place where the collision occurred, you could see just by looking at them that they drifted over what half of the roadway would be.  Even though there was no dividing line, just a visual observation showed that they were over the middle; and you could see the southbound tire tracks passing into the same area where they were, and the two vehicles collided at that point.

Without further objection, defense counsel then continued his questioning as follows:

> Q.     Thank you.  When you said middle, there is no line painted on this dirt road; is that right?
>
> A.     No, there is not.
>
> Q.     So can you explain for me what you meant by middle or center line?
>
> A.     Well, just a general observation that anybody would make if you look at a county road, really no highly scientific way of doing it. You just look at the road and you just divide it in half as equally as you possibly can.  And just by looking at it, I could tell that one guy was too far over.

When answering the above questions, Officer Dahlsten did not refer to any exhibits or diagrams showing a measured reconstruction of the respective locations of the two vehicles' tire tracks.

On cross-examination, Plaintiffs' counsel questioned Officer Dahlsten extensively on the subject of the vehicles' tire tracks.  Plaintiffs' counsel also showed the officer the

first page of the accident report in order to point out a clerical error in identifying the driver of each vehicle. Defense counsel responded by arguing that this reference to the accident report opened the door to further questioning about its second page, which contained a diagram depicting the road with a center line and a point of impact. The district court sustained Plaintiffs' counsel's objection to this line of questioning, and thus Officer Dahlsten was not permitted to testify regarding the diagram he had drawn on the second page of his accident report.

After the jury rendered its verdict, Plaintiffs filed a motion for a new trial. In their motion and on appeal, Plaintiffs claim that the district court erred by admitting at trial the exact type of expert testimony from Officer Dahlsten which previously had been excluded in the pretrial ruling at the *Daubert* hearing. That is, when Officer Dahlsten testified at trial regarding the observed location of the tire tracks in relation to the middle of the roadway, Plaintiffs contend that the officer overstepped the boundaries of a trained observer testifying as an accident *investigator* and assumed the role of an expert witness testifying as an accident *reconstructionist.* According to Plaintiffs, this testimony provided the only evidence from which the jury could have inferred that Plaintiff Donald Weaver was negligent.

Defendants deny that Officer Dahlsten's trial testimony was the sole basis for finding that Plaintiff Donald Weaver was negligent, and they find no contradiction between the district court's evidentiary rulings at trial and its pretrial rulings with regard to the scope of Officer Dahlsten's role as an accident investigator. According to

Defendants, the point of these rulings was not to entirely exclude all testimony regarding the relevant features of the accident scene that Officer Dahlsten observed, but rather to define the context in which he could describe such features in his testimony. Specifically, Defendants contend that the district court prohibited Officer Dahlsten from cloaking his opinions in the precise, measured analysis of an accident reconstructionist, but permitted him to testify regarding his own observations as a trained accident investigator.

On appeal, we review the district court's rulings on the admissibility of Officer Dahlsten's testimony for abuse of discretion, and we will set aside the jury's verdict only if we find an error in these rulings that "prejudicially affects a substantial right of a party." *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1049 (10th Cir.1993). Evidence admitted in error "can only be prejudicial if it can be reasonably concluded that with or without such evidence, there would have been a contrary result." *Id. See also Webb v. ABF Freight System, Inc.*, 155 F.3d 1230, 1246 (10th Cir. 1998). Where a motion for a new trial asserts that the district court erred in determining the admissibility of evidence, the verdict must stand unless the district court "'made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *Hinds*, 988 F.2d at 1046 (quoting *Mayhue v. St. Francis Hosp.*, 969 F.2d 919, 922 (10th Cir.1992)).

Applying this standard, we conclude that any deviation from the district court's pretrial rulings on the permissible scope of Officer Dahlsten's testimony was harmless error. This is not a case in which a district court entirely abandoned its gatekeeping role with respect to the admission of expert testimony at trial, nor is it a case where a party

surreptitiously introduced expert testimony from a witness who had never been previously disclosed as such. Furthermore, Plaintiffs have made no argument that their trial presentation or evidence would have differed had they known earlier of the purported deviation from the pretrial ruling on the scope of Officer Dahlsten's testimony.

Rather, this case presents a situation where the district court and the parties were drawing fine distinctions about the permissible scope of a witness's trial testimony on subjects that were previously disclosed and subject to rigorous analysis at a *Daubert* hearing. Drawing such fine distinctions concerning the scope of an expert's testimony is heavily dependent on the particular context in which that testimony is presented at trial, and therefore this task may not be amenable to a definitive and unequivocal pretrial ruling.

In similar contexts, we have recognized that even "'[u]nder the best of circumstances, counsel must exercise caution in relying exclusively upon rulings made in connection with pretrial motions *in limine* as the basis for preserving claims of error in the admission and exclusion of evidence.'" *United States v. Sides*, 944 F.2d 1554, 1559 (10th Cir. 1991) (quoting *Conway v. Electro Switch Corp.*, 825 F.2d 593, 596 n. 1 (1st Cir.1987)). We also have recognized that "'[p]rudent counsel will renew objections [ruled on by the district court in a motion in limine] at trial ... [because] most objections will prove to be dependent on trial context and will be determined to be waived if not renewed at trial'" *Minshall v. McGraw Hill Broadcasting Co.*, 323 F.3d 1273, 1284 (10th Cir. 2003) (quoting *United States v. Mejia-Alarcon*, 995 F.2d 982, 986 (10th Cir.1993)).

In light of this recognized need to renew objections at trial, it is generally not reversible error for a district court to revisit an issue that is the subject of a previous ruling on a motion *in limine*. *See id.*

Here Plaintiffs preserved the issue raised in their motion *in limine* concerning the scope of Officer Dahlsten's expertise by renewing their objection at trial. But we will not find reversible error simply because, in response to this renewed objection, the district court chose to reconsider or refine its earlier pretrial ruling in light of the specific context in which the testimony was presented at trial. Rather, the critical questions are whether Officer Dahlsten's trial testimony violated the *Daubert* principles which the district court had previously articulated at the pretrial hearing, and if so, what effect this testimony had on the outcome of the trial.

With respect to the first question, we find it significant that Officer Dahlsten's trial testimony about where he observed the tire tracks in relation to the middle of the roadway was not cloaked under any scientific or technical methodology, nor did he refer to a diagram or exhibit evincing a measured reconstruction of the accident scene during this portion of his testimony. Instead, the officer was careful to explain that his remarks about the location of the middle of the road were based on "just a general observation that anybody would make if you look at a county road." Thus, Officer Dahlsten's trial testimony on this point has none of the indicia of an expert opinion based on the specialized methodology or technical measurements of an accident reconstructionist and instead falls closer to what the district court had earlier characterized as "fact testimony

-10-

based on his observations at the scene." Plaintiffs' counsel was free to point out the absence of such indicia of an expert opinion during cross-examination and closing argument.

We also conclude that Officer Dahlsten's trial testimony did not control the outcome of the trial because even if the jury found it to be credible, the district court's instructions to the jury on how to apportion fault between the two drivers did not necessarily depend on which driver, if any, crossed the center line of the roadway. In addition to the general negligence instruction based on the duty to exercise reasonable care, the district court's jury instructions listed no less than five ways that a person's driving could be considered negligent *per se*:

> In this case, the law presumes that when vehicles collide, a driver is negligent if that driver (1) was on the wrong side of the road at the time of the collision, or (2) failed to yield one-half of the main travelled portion of a roadway as nearly as possible, or (3) followed a vehicle more closely than was reasonable and prudent with regard to the speed of such vehicles, the traffic upon the roadway, and the condition of the roadway, or (4) drove in a careless and imprudent manner without regard for the width, grade, curves, corners, traffic, and all other attendant circumstances, or (5) drove at a speed greater than was reasonable under the conditions then existing.

These instructions gave the jury several options for apportioning fault between the two drivers.

For example, there was evidence from which the jury could have reasonably inferred that both drivers' visibility was impaired because they were driving through a cloud of dust generated by a dump truck hauling grain that had traveled on the roadway shortly before the accident. Thus, the jury could have reasonably inferred that both

-11-

drivers were at fault for continuing to drive through the cloud of dust when their visibility was impaired, or failing to slow down while driving through the dust cloud. The jury also may have reasonably inferred that such impaired visibility meant that neither driver could see exactly where his vehicle was located in relation to the center or side of the roadway, much less the presence of the other vehicle as it approached in the opposite direction.

It is also significant that the collision at issue here occurred on an unpaved farming road where the witnesses testified it was customary for drivers to stay closer to the middle of the roadway in order to avoid sinking into the soft dirt shoulders. In this context, the unreasonableness of driving closer to the center of the road is not as obvious as it would be in the case of a wider, paved road with a painted centerline or designated traffic lanes for each vehicle. A rational fact-finder taking these conditions into account could have concluded that even if Plaintiff Donald Weaver's vehicle was traveling closer to the middle of the roadway than one would expect in the case of a paved and marked street, he was not traveling on the wrong side of the road or failing to yield half the roadway as nearly as possible.

Thus, the admission of Officer Dahlsten's testimony did not require the jury to find that Plaintiff Donald Weaver was negligent as a matter of law. Indeed, the jury could have discounted Officer Dahlsten's testimony entirely based on the points Plaintiffs' counsel raised during the cross-examination of this witness. For these reasons, we conclude that it was not reversible error to admit Officer Dahlsten's trial testimony concerning where he observed the vehicles' tire tracks.

II.

Plaintiffs next challenge the district court's pretrial ruling on a motion *in limine* to exclude evidence that Defendant Chase Blake, who was thirteen years old at the time of the accident, did not have a valid Colorado driver's license. In response to this issue, Defendants point out that evidence touching on Defendant Chase Blake's age and lack of a driver's license was admitted at trial notwithstanding the Court's pretrial ruling on the motion *in limine*. In particular, Plaintiffs' counsel referred to Defendant Chase Blake's lack of a driver's license during his cross examination of Defendant Rodney Blake. The district court subsequently instructed the jury on the duty owed by an unlicensed driver, and Plaintiffs' counsel again referred to this issue during closing argument.

Given that the jury was presented with some testimony, argument, and instruction concerning Defendant Chase Blake's unlicensed status, any error in the district court's pretrial ruling on this issue is harmless. As noted above, we will not set aside a jury verdict based on an error in the admission or exclusion of evidence unless the error prejudicially affects a substantial right of a party. *See Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1253 (10th Cir. 2005). "The effect on the jury is only prejudicial if it can be reasonably concluded that the admission or exclusion made a difference." *Id.* It is not reasonable to conclude that the pretrial ruling which granted Defendants' motion *in limine* to exclude evidence of Defendant Chase Blake's unlicensed status made any significant difference in the trial when Plaintiffs were able to present such information to the jury at trial notwithstanding the district court's pretrial ruling. Therefore, the district court's

pretrial ruling on this issue provides no basis for setting aside the jury's verdict in this case.

III.

Plaintiffs also challenge the district court's failure to instruct the jury on a theory of negligence *per se* based on Defendant Chase Blake's status as an unlicensed driver. The district court applied the substantive law of the State of Colorado in this case, and Plaintiffs do not cite any authority from Colorado's appellate courts which expressly recognizes a driver's unlicensed status as the basis for a claim of negligence *per se*. On the contrary, Colorado's appellate courts appear to follow the majority rule that whether or not a person has a valid driver's license is irrelevant to the question whether that person was driving negligently at the time of the accident. *See Lawrence v. Taylor*, 8 P.3d 607, 610 (Colo. Ct. App. 2000) (citing and following the majority rule in other jurisdictions).

The rationale for this general rule is that unlike traffic regulations such as speed limits, licensing statutes do not in themselves create a standard of care that a driver is expected to meet while operating a motor vehicle. In most cases, it is the driver's behavior while operating the vehicle, rather than the lack of a license, that is relevant to determining the cause of the accident. The standard of care that applies to such behavior is generally the same regardless of whether the driver is licensed or unlicensed.

Plaintiffs attempt to distinguish this case from the general rule recognized in *Lawrence* on the grounds that Defendant Chase Blake's age brought him within the

purview of one or more specific statutes applicable to teenage drivers.  See Colo. Rev. Stat. §§ 42-2-104(4)(b), 42-2-105.5 (1999).  Neither the teenage-driver statute nor the general licensing statute, however, create a distinction between the standard of care required of licensed drivers and that required of unlicensed drivers in this context.  These statutes also do not create a distinction between the standard of care required of adult drivers and that required of minor drivers.

For these reasons, we conclude that the district court did not err by rejecting such distinctions and instructing the jury that:  "A minor driver has a duty to exercise the same reasonable care that an adult driver would in the same or similar circumstances.  An unlicensed driver has a duty to exercise the same reasonable care that a licensed driver would in the same or similar circumstances."  Plaintiffs were not unfairly prejudiced by this instruction as it gave them ample opportunity to argue that Defendant Chase Blake's driving was negligent because it fell below the standard of care required of an adult, licensed driver.

IV.

Plaintiffs' next contention is that the district court unduly coerced the jury to reach a unanimous verdict by placing a time limit on their deliberations on Friday evening.  The record reflects that this case was tried over the course of five days (Monday through Friday) and was then submitted to a twelve-member jury at 2:44 p.m. on Friday, May 2, 2003.  Immediately after the jury retired to commence its deliberations, the district court met with counsel and informed them that:  "I ordinarily allow a jury to deliberate at least

-15-

until 5:00, sometimes a few minutes after 5, but we lose our court security for the jury by 6, so we will not be having deliberations past 6:00 this evening."

At 5:17 p.m., the district court again met with counsel outside the jury's presence and advised that: "We're getting close to the time that we need to release the jury for the weekend to reconvene for their deliberations on Monday morning." The district court also advised counsel that one of the jurors, Mr. J.H.[1], "has a family medical matter that is arising on Monday" and, therefore, may ask to be excused when the jury was called in at the end of the day. Unbeknownst to the district court or counsel at that time, the jury had selected Mr. J.H. to be their foreperson.

At the 5:17 p.m. conference, the district court asked counsel to state their respective positions in the event that the jury did not return a verdict before the end of the day and Mr. J.H. asked to be excused from the jury. Plaintiffs' counsel stated that his "initial reaction" was

> that this is what we discussed, which is that's why we're going to have 12 people and if this happens and we have to let someone go we still have 11 people. So I'd kind of like to defer to Mr. Weiss[2] for a moment. My initial reaction is if he has to go, we have the alternates. But I do want to take a quick look here.

Defendants' counsel had no objection to excusing Mr. J.H. at the end of the day "if he needs to deal with his personal matter."

---

[1]Out of respect for the juror's privacy, we redact his full name and refer to him by his initials in this opinion.

[2]Mr. Weiss was Defendants' trial counsel.

-16-

The jurors continued to deliberate until 5:24 p.m., when they were brought into the courtroom at the direction of the district court. At that time, the district court instructed and queried the jury as follows:

> THE COURT: Ladies and gentlemen of the jury, we're at the end of the day. We lose our security services in the next half hour, and that is why I have reconvened here, so that I can release you for the weekend. Before I do that, let me inquire who has been selected as the foreperson of the jury. Would you stand, sir, and give us your name.
>
> JUROR: I'm J.H.
>
> THE COURT: Mr. J.H., has the jury considered when they would like to reconvene tomorrow--or on Monday morning.
>
> JUROR: Your honor, at least two jurors have a conflict on Monday. We felt, as we just informed the guard, we're probably within 30 to 40 minutes of reaching a verdict.
>
> THE COURT: Well, we--as I said, we lose our security services at 6:00, no later than 6:00 this evening. I am willing to let you go until 5:45, but we cannot go beyond that time and still have you out of the building by the time that we lose our security services. Is it the jury's desire to continue to deliberate until 5:45, or would you rather reconvene on Monday morning?
>
> JUROR: We would like to go until 5:45, your Honor.
>
> THE COURT: All right, then. We will excuse you to continue your deliberations, and we'll reconvene at 5:45.

After the jury left the courtroom at 5:25 p.m., the district court advised counsel that:

> We'll take a recess until 5:45. And in all fairness, we cannot go beyond that time, because if we do have a verdict, we need to receive it and then have the jurors cleared out of the building. If we do not have a verdict by that time, we nonetheless have to have the jurors cleared out of the building by 6:00.

-17-

So 5:45 really is a firm time period. I ask that you be in the courtroom at that time and we'll reconvene.

We'll stand in recess till then.

When the district court issued these instructions, neither party stated any objection to the district court's handling of the jury deliberations or suggested an alternative that would have allowed the jury to continue deliberating past 5:45 p.m. on Friday or avoided a scheduling conflict if deliberations resumed on another date.

About one minute before the 5:45 p.m. deadline, the district court received a note indicating that jury had reached a verdict. The district court then reconvened in the courtroom with the jury and counsel present, and the jury returned its verdict finding that each party was 50% at fault and that Plaintiffs were entitled to zero damages. The jury was polled and each juror stated that this was their verdict.

After the jury was excused, Plaintiffs challenged the district court's imposition of a time limit on the Friday evening jury deliberations by orally moving for a mistrial and later filing a written motion for a new trial. In their motion and on appeal, Plaintiffs assert that the district court's decision to set deadline of 5:45 p.m. on that date was unduly coercive. They point out that when the district court conveyed this deadline to the jury, the district court already knew that the jury had estimated they were within 30 to 40 minutes of reaching a verdict and that the jury foreperson, Mr. J.H., as well as one other juror, indicated they had scheduling conflicts on the following Monday.

Plaintiffs also cite the general rule that: "It [i]s impermissibly suggestive and coercive for the Court to place a time fuse on the period of jury deliberation. Such constitutes reversible error." *Goff v. United States*, 446 F.2d 623, 626 (10th Cir. 1971). As for their failure to timely object to the instructions given to the jury at 5:24 p.m., Plaintiffs claim that they were not given a fair opportunity to object on that occasion because the foreperson's request to continue deliberating for another 30-40 minutes was not anticipated at the 5:17 p.m. conference with counsel.

We do not agree with Plaintiffs' assertion that they lacked a fair chance to object to the Court's instruction. If Plaintiffs felt that the jury should be given more time to deliberate on Friday afternoon, they could have raised this issue either at the 5:17 p.m. conference, when the district court proposed to recess for the day, or immediately after the 5:24 p.m. instruction to the jury, at which time Plaintiffs could have pleaded with the Court for more time or suggested other alternatives to recessing at 5:45 p.m. We also note that Plaintiffs' counsel never inquired as to the extent of the two jurors' alleged scheduling conflicts on the following Monday, and thus there is no record of whether these conflicts would in fact have prevented the jury from reconvening to continue deliberations at some point during the following week.

Insofar as Plaintiffs failed to timely object to the district court's instruction on this issue or suggest an alternative, we review the district court's instructions to the jury for plain error. *See generally* Fed. R. Civ. P. 51; *see, e.g., United States v. Ellzey*, 936 F.2d 492, 500 (10th Cir. 1991) (applying the plain error test to the issue of whether an *Allen*

-19-

instruction was unduly coercive).  Under this standard of review, a reviewing court will not reverse unless there is "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'   If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Johnson v. United States*, 520 U.S. 461, 467 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

Instructions that place a time limit on jury deliberations may raise the same type of concerns as *Allen* instructions, which are sometimes given during the course of deliberations when a jury indicates that it is having difficulty coming to a unanimous verdict.  "The ultimate question . . . is whether the . . . instruction was 'impermissibly coercive in a way that undermined the integrity of the deliberation process.'" *United States v. McElhiney*, 275 F.3d 928, 940 (10th Cir. 2001) (quoting *United States v. Porter*, 881 F.2d 878, 889 (10th Cir. 1989)).  "'[T]he test effectively turns on a consideration of whether the court's instruction imposed such confusion or pressure on the jury to reach a verdict that the accuracy and integrity of the verdict returned becomes uncertain.'" *Id.* (quoting  75B Am.Jur.2d § 1581, at 343).  Where an unduly coercive time limit on deliberations causes grave uncertainty about the accuracy or integrity of a jury's verdict, the error may "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732; *cf. Burroughs v. United States*, 365 F.2d 431, 434 (10th Cir. 1966) (reversing a judgment based on a trial court's impermissibly coercive

*Allen* instruction even though the defendant failed to object until after the jury returned its verdict).

In assessing the "coerciveness" of a court's jury instructions, we follow a case-by-case approach, "considering such factors as '(1) [t]he language of the instruction, (2) its incorporation with other instructions;  and (3) the timing of the instruction.'" *McElhiney*, 275 F.3d at 940 (quoting *Porter*, 881 F.2d at 888).  "The 'colloquy between the judge and the jury foreman, [the] circumstances surrounding the giving of the instruction, and consideration of the American Bar Association Standards on Criminal Justice Relating to Trial by Jury' may also be relevant."  *Id.* (quoting *United States v. Dyba*, 554 F.2d 417, 421 (10th Cir.1977)); *see also* 75B Am. Jur. Trials § 1601 (2005) (summarizing relevant factors).

In *Burroughs*, 365 F.2d at 434, we made a distinction between "entreat[ing] . . . [the jury] to strive toward a verdict by a certain time" and "tell[ing] the jury that if they have not arrived at a verdict by a stated time, they should return to the court room for further instructions concerning whether they should deliberate further or be excused until the next day."  The latter practice is permissible, while the former is not.  *See id.*

Illustrating the former practice is *Goff*, 446 F.2d at 626, where we found reversible error in a trial court's instruction that: "If you cannot (reach a verdict) within, oh, we'll say the next hour or so and probably ought to go to lunch first, then, we'll have to declare a mistrial and set the case down for hearing again."  Such an instruction "place[d] a time

fuse on the period of jury deliberation" that "was impermissibly suggestive and coercive."

*Id.*

But we reached a different conclusion in *Glazerman v. United States*, 421 F.2d 547 (10th Cir. 1970), where the trial court gave the following instruction before sending the jury to deliberate:

> Now, I am going to send you to the jury room and ask you to begin your deliberations; continue your deliberations for a reasonable period of time. If it appears that you are going to have to take a great deal longer than a reasonable hour, why send word to me and I will see whether or not I can allow you to go home for the night and return to complete your deliberations tomorrow. But, I would like for you to see if you can arrive at a verdict this afternoon.

*Id.* at 554. Reviewing this instruction on appeal, we reasoned that:

> Absent an indication that the jury was given a very short time to deliberate that afternoon, we can only conclude that the reasonable impact of the instruction was to advise the jury that they would be required to work for only a reasonable length of time that day and if they failed to reach a verdict by the end of the ordinary work day, the court would dismiss them for the night and have them return in the morning to complete their deliberations. We do not favor the words used in this instruction especially since it is perilously close to the instruction we found objectionable in *Burroughs v. United States*, 365 F.2d 431 (10th Cir. 1966). But the circumstances and context are sufficiently different to require a different conclusion.

*Id.* While expressing disfavor with some of the language used by the district court in that case, we concluded that the jury instructions as a whole did not warrant reversal. *See id.*

We reach a similar conclusion in this case. The district court's instructions as a whole were not unduly coercive when viewed in context; however, some of the language used by the district court came perilously close to suggesting that there was a time limit

-22-

on the jury's deliberations.  When feasible, district courts should strive to accommodate a jury's request to continue deliberating on a given date.  Requiring court personnel to stay a reasonable additional amount of time to accommodate a jury's request to continue deliberating is ultimately less costly to the administration of justice than requiring an entire case to be retried because of an unduly coercive time limit on jury deliberations.

The fact that the work schedules of courthouse security personnel influenced the district court's decision-making on this point does not make its instruction to the jury immune from review or subject to a lesser standard than we apply in other cases.  *See United States v. Smith*, 426 F.3d 567, 571-72 (2d Cir. 2005).  In this regard, the district court's remarks to the jury cannot be dismissed as mere "observations" about the work schedules of other agencies or personnel beyond the district court's control.  *See McElhiney*, 275 F.3d at 941.  Regardless of who controls the work schedules of courthouse security personnel, it is the district court's responsibility to instruct the jury in a manner that does not place an unduly coercive time limit on their deliberations.  *Cf. Smith*, 426 F.3d at 576 (expressing similar concerns about a district court's duties regarding courthouse security measures that implicate the Sixth Amendment right to a public trial and the First Amendment right to courtroom access).

Adherence to these principles, however, did not preclude the district court from setting a firm stopping point for the jury to discontinue its deliberations on Friday evening so long as the options for resuming deliberations at another date and time were kept open. We recognize that in some circumstances, requiring the jury to continue its deliberations

late into the evening could be viewed as more coercive than requiring them to go home and return during the following week. *Cf. Porter*, 881 F.2d at 889 (noting that, in the context of an *Allen* charge, "[t]he judge further alleviated any sense of coercion by excusing the jury until the following morning").

Other courts that have addressed similar concerns generally afford trial judges wide latitude in determining "the length of time that the jury will be allowed to deliberate on a given day." *See, e.g., Williams v. State*, 422 S.E.2d 309, 311 (Ga. Ct. App. 1992). Thus, for example, the Georgia Court of Appeals concluded that there was no abuse of discretion in setting a 6:00 p.m. time limit on jury deliberations when it was clear that the jury would be permitted to resume deliberations the following day if they did not reach a verdict by that time. *See id.* at 311-12. And the Georgia Supreme Court reasoned that it was not unduly coercive for a trial court to suggest that a jury recess for the weekend because "the surrounding parking garages closed at 6:00 o'clock," so long as jurors were left with the option to continue deliberating after this instruction was given. *Holland v. Morse*, 210 S.E.2d 734, 736 (Ga. 1974).

While we do not endorse the precise language of the district court's instruction in this case, we nevertheless conclude that the jury was not coerced to such a degree as to call into question the accuracy or integrity of its verdict. As in *Holland*, 210 S.E.2d at 736, it was the jury, not the judge, that asked to continue deliberations when the courthouse closing time approached, and the jury's foreperson only estimated, and did not demand, that it would take an additional 30-40 minutes to reach a verdict. Thus, it is

-24-

reasonable to infer that when given the opportunity to deliberate further, the jurors simply found that they were able to reach a verdict in less than the amount of time that the foreperson had previously estimated.

Because the jury reached its verdict before the 5:45 p.m. deadline, the district court never had occasion to reach the issue of whether the two jurors who said they could not return on Monday would need to be excused, or whether there was some other way to accommodate their schedules. The record does not reflect that counsel suggested any alternatives to the schedule for completing deliberations that the district court employed, and since the district court seated a twelve-member jury, it was possible for up to six jurors to be excused without violating the requirements of Fed. R. Civ. P. 48. Under these circumstances, a finding that the jury was unduly coerced because two of the twelve jurors expressed a need to avoid scheduling conflicts on the following Monday would be based on speculation rather than reasonable inference. Accordingly, we conclude that the district court's decision to place a 5:45 p.m. time limit on jury deliberations on Friday evening does not provide a basis for setting aside the jury's verdict in this case.

V.

Plaintiffs' final challenge on appeal concerns the verdict form, which asked the jury to determine the amount of Plaintiffs' damages separately from its apportionment of fault between the parties. The jury wrote in "$0" for the amount of Plaintiffs' damages and then found that each party (Plaintiffs and Defendants) was 50% at fault.

-25-

In fashioning the verdict form, the district court applied Colorado's comparative negligence law, which provides that a plaintiff is not entitled to collect any damages from a defendant if the plaintiff's percentage of responsibility is fifty percent or more. *See* Colo. Rev. Stat. § 13-21-111(1) (2005) ("Contributory negligence shall not bar recovery in any action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, *if such negligence was not as great as the negligence of the person against whom recovery is sought . . . .*") (emphasis added); *Lonardo v. Livtak Meat Co.*, 676 P.2d 1229, 1231 (Colo. Ct. App. 1983) (recognizing this principle). In accordance with Colorado law, the jury was instructed that: "if you find that Mr. Weaver's percentage of responsibility is 50 percent or more, the Plaintiff will not recover any damages." Thus, there is no inconsistency between the jury's verdict awarding zero damages and the 50% apportionment of fault between the parties, because a plaintiff who is at least fifty percent at fault is not entitled to an award of damages under Colorado law. *See Lonardo*, 676 P.2d at 1231-32.

It is true that the procedure specified in Colorado law also calls for a jury to first determine "[t]he amount of the damages which would have been recoverable if there had been no contributory negligence" and then determine "[t]he degree of negligence of each party, expressed as a percentage." Colo. Rev. Stat. § 13-21-111(2). If the jury had correctly followed this procedure by first determining the total amount of damages irrespective of the apportionment of fault, then its award of zero damages would not be consistent with the parties' stipulation at trial that Plaintiff Donald K. Weaver's losses for

past and future household services were $59,200, and his future medical expenses were $50,000.

Accordingly, Plaintiffs contend that the jury should have entered a number equal to or greater than these amounts on the verdict form and only then apportioned fault between the parties to arrive at the conclusion that Plaintiffs were not entitled to any damages. Instead, the jury appears to have apportioned fault first and then entered "zero" in the damages column based on its finding that Plaintiff Donald Weaver was fifty percent at fault. Plaintiffs speculate that this error might have occurred because the jurors were rushed when the district court told them they could only deliberate until 5:45 p.m. on Friday evening.

We conclude that the jury's procedural error in filling out the verdict form is harmless because their apportionment of fault is entirely dispositive under Colorado law. *See Lonardo*, 676 P.2d at 1232. Given the jury's finding that Plaintiff Donald Weaver was fifty percent at fault, it would not have mattered what figure the jury entered in the damages column. Upon receiving a jury's verdict that the proportion of Plaintiffs' negligence "is equal to or greater than the negligence of the person against whom recovery is sought," Colorado's comparative negligence law requires the court to "enter a judgment for the defendant." Colo. Rev. Stat. § 13-21-111(3). For these reasons, the manner in which the jury filled out the verdict form does not provide grounds for reversing the district court's judgment.

VI.

Defendants have filed a conditional cross appeal challenging the district court's decision to exclude the expert testimony of Stephen Fenton, P.E., an engineer whom Defendants had retained to opine on the subject of accident reconstruction. We do not have occasion to reach this issue because we affirm the district court's judgment in Defendants' favor. "A party who is not aggrieved by a judgment ordinarily may not appeal from it." *United States v. Lewis County*, 175 F.3d 671, 679 (9th Cir. 1999) (citing *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 333 (1980)). Because we do not reverse the district court's judgment in Defendants' favor, there is no basis to hear a cross-appeal that is conditioned on reversal of that judgment. *See Guile v. United States*, 422 F.3d 221, 231 n.14 (5th Cir. 2005); *Kearney v. J.P. King Auction Co.*, 265 F.3d 27, 30 n.3 (1st Cir. 2001). We therefore dismiss Defendants' cross-appeal as moot.

VII.

For the foregoing reasons, the judgment of the district court is AFFIRMED, and Defendants' cross appeal is DISMISSED as moot.