FILED
United States Court of Appeals
Tenth Circuit

June 19, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KAREN HENNING, as Administrator
of the Estate of Derek Shockey,
Deceased,

        Plaintiff - Appellant,

    v.

UNION PACIFIC RAILROAD
COMPANY,

        Defendant - Appellee.

No. 06-7034

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. NO. CV-04-44-KEW)**

---

Michael T. Blotevogel, The Lakin Law Firm, Wood River, Illinois (Charles W.
Armbruster III and Gail G. Renshaw, The Lakin Law Firm, Wood River, Illinois;
Robert H. Mitchell, Mitchell & Manchester, Oklahoma City, Oklahoma, with him
on the briefs), for Plaintiff-Appellant.

Robert D. Hart (Tom L. Armstrong and Christopher D. Wolek with him on the
briefs), Gibbs Armstrong Borochoff Mullican & Hart, P.C., Tulsa, Oklahoma, for
Defendant-Appellee.

---

Before **MURPHY**, **SEYMOUR**, and **BALDOCK**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

This case arises out of a car-train accident, in which Derek Shockey was killed. Shockey's estate sought damages from Union Pacific Railroad Company ("Union Pacific") on various claims of negligence. The district court granted Union Pacific's motion for partial summary judgment on claims relating to the adequacy of the warning devices at the crossing based on federal preemption. The remaining claims went to trial. The jury returned a verdict for the defendant railroad company. Shockey's estate appeals from the district court's grant of partial summary judgment to Union Pacific and its denial of a motion for a new trial.

In this court, Shockey's estate argues recent amendments to the Federal Railroad Safety Act save its signalization and negligent delay claims from preemption. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. Because the amendments do not apply to this case, we **affirm** the district court's summary judgment ruling. The district court, however, erred by applying the wrong standard to the motion for a new trial. We hold this error was not harmless and therefore **reverse** and **remand** to the district court to consider the motion under the proper standard.

## I. BACKGROUND

Derek Shockey was killed on October 27, 2002, when the vehicle he was driving collided with a train operated by Union Pacific at the Shurley Street

crossing in Sallisaw, Oklahoma. Shockey was fifteen years old at the time of his death. Teresa Henning, individually and as Administrator of Shockey's Estate (hereafter "Henning")[1], brought a wrongful-death action under the Oklahoma Wrongful Death Act. She alleged Union Pacific acted in a negligent or reckless manner by, *inter alia*, failing to timely install active warning devices,[2] such as lights and gates. The district court granted partial summary judgment in favor of Union Pacific, concluding the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101–20155, preempted Henning's claims relating to the adequacy of the warning devices installed at the Shurley Street crossing, including any claims that Union Pacific negligently delayed installing a new warning device.[3]

A four-day trial was held on Henning's remaining claims, which alleged Union Pacific negligently or recklessly (1) failed to timely sound its horn as the

---

[1]Theresa Henning was Shockey's mother. During the pendency of this appeal, Henning passed away and her mother, Karen Henning, was substituted as the representative for the Estate.

[2]The relevant definitions state: "'Passive Warning Devices' means those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train." "'Active Warning Devices' means those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train." 23 CFR § 646.204 (2003).

[3]The district court also granted summary judgment to Union Pacific on Henning's claims of excessive train speed and inadequate locomotive equipment. Henning does not appeal the ruling with respect to these claims.

train approached the crossing; (2) failed to sound a proper horn pattern as the train approached the crossing; and (3) failed to clear vegetation from the right-of-way at the crossing. The jury returned a verdict for Union Pacific. Henning moved for a new trial, pursuant to Rule 50 of the Federal Rules of Civil Procedure, citing evidentiary and instructional errors. The court denied the motion but erroneously applied the standard for judgment as a matter of law.

## II.    FEDERAL PREEMPTION

The Shurley Street crossing was equipped with crossbucks[4] and a stop sign to alert drivers to the potential danger of passing trains. This passive warning system was installed with the use of federal funds. On March 2, 1999, the City of Sallisaw, Oklahoma requested the installation of flashing signals and gates at the Shurley Street crossing. The Oklahoma Transportation Commission approved the upgrades on September 4, 2001 and the Federal Highway Administration ("FHWA") followed suit, approving the upgrades and agreeing to furnish the funds for the upgrades on September 11, 2001. The active warning system was completed with federal funds in November of 2002, less than a month following the fatal accident. Henning's complaint alleged Union Pacific was negligent by failing to install the lights and gates at the crossing (inadequate "signalization") and for negligently delaying their installation. The district court held these

---

[4]Crossbucks are "black-and-white, X-shaped signs that read 'RAILROAD CROSSING.'" *See Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 350 (2000).

claims were preempted by the FRSA. On appeal, Henning renews her argument that her claim of negligent delay is not preempted because the regulations do not "substantially subsume the subject matter" of state tort law where the claim is negligent delay, not negligent selection of a crossing design. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (explaining preemption lies only where federal law substantially subsumes the subject matter of the relevant state law). She also argues recent amendments to the preemption provision of the FRSA permit her claim that Union Pacific failed to comply with federal standards. We review a district court's preemption ruling de novo. *Steinbach v. Dillon Companies, Inc.*, 253 F.3d 538, 539 (10th Cir. 2001). Because we conclude the FRSA preempts both Henning's inadequate signalization and negligent delay claims, the district court's summary judgment ruling is affirmed.

## A.    The FRSA and Preemption

The Supremacy Clause of the United States Constitution provides the laws of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. It is well-established that Congress possesses the power to preempt state law and that a federal agency, acting within the scope of its congressionally delegated authority may also preempt state law. *La. Pub. Serv. Comm'n. v. FCC*, 476 U.S. 355, 369 (1986).

The FRSA was enacted in 1970 to "promote safety in every area of railroad operations and to reduce railroad-related accidents and incidents." 49 U.S.C.

§ 20101. The FRSA grants the Secretary of Transportation the authority to "prescribe regulations and issue orders for every area of railroad safety." *Id.* § 20103(a). Under this grant of authority, the Secretary is instructed to "maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem." *Id.* § 20134(a). The FRSA also contains an express preemption provision:

> Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement.

*Id.* § 20106(a).

Congress then enacted the Highway Safety Act in 1973, which created the Federal Railway-Highway Crossings Program ("Crossings Program"). *See* 23 U.S.C. § 130. Under this program, states are eligible for federal funds for the "cost of construction of projects for the elimination of hazards of railway-highway crossings." *Id.* § 130(a). States must conduct and systematically maintain a survey of all highways and identify which crossings require warning devices. *Id.* § 130(d). The state must then implement a schedule of projects that, at a minimum, provide signs for all railway-highway crossings. *Id.*

The Secretary, through the FHWA, has promulgated several regulations implementing the Crossings Program. At issue in this case are the regulations addressing the design of the grade crossing improvements. Where certain conditions are present, such as multiple main line railroad tracks or high-speed trains, the railway crossing warning system is deemed adequate if it contains automatic gates and flashing lights. 23 C.F.R. § 646.214(b)(3). Otherwise, a crossing device is adequate so long as it is subject to the approval of FHWA. *Id.* § 646.214(b)(4).[5] In *CSX Transportation, Inc. v. Easterwood*, the Supreme Court

---

[5]Sections 646.214(b)(3) and (4) provide in full:

(3)(I) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

 (A) Multiple main line railroad tracks.

 (B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

 (C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.

 (D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

 (E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of school buses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any

(continued...)

-7-

held that § 646.214(b)(3) and (4) "establish requirements as to the installation of particular warning devices" and "when they are applicable, state tort law is pre-empted." 507 U.S. at 670. This conclusion was premised on the rationale that § 646.214(b)(3) and (4) "displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." *Id.* Thus, those regulations "effectively set the terms under which railroads are to participate in the improvement of crossings." *Id.*

The Supreme Court revisited this regulation in *Norfolk Southern Railway Co. v. Shanklin*, 529 U.S. 344, 352-59 (2000). It explained that *Easterwood* established the broad preemptive effect of federal law in this area. Sections 646.214(b)(3) and (4) "pre-empt state tort claims concerning the adequacy of *all* warning devices installed with the participation of federal funds." *Id.* at 357. The Court held because the warning device at the crossing had been approved by

---

[5](...continued)
    combination of these conditions.

    (F) A diagnostic team recommends them.

(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.

(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

the FHWA and "installed using federal funds, the federal standard for adequacy displaced [state] statutory and common law[,]" thus preempting the plaintiff's wrongful death claim. *Id.* at 359. Federal preemption will apply to a state-law claim even when there is no specific determination by the federal or state authorities that the devices were "adequate" for that particular crossing; the touchstone is federal funding. *Id.* at 353-57.

Once state regulation of a railroad crossing is preempted, later decisions to upgrade warning devices at a crossing do not "suspend" preemption. *See Armijo v. Atchinson, Topeka & Santa Fe. Ry. Co.*, 87 F.3d 1188, 1192 (10th Cir. 1996). In *Armijo*, the plaintiff brought a wrongful death action on behalf of her husband who was killed at a railroad crossing. *Id.* at 1188. The crossing was protected by crossbucks with reflectors which were installed with the use of federal funds under the Crossings Program. *Id.* at 1190. Before the decedent was killed, the State of New Mexico placed the crossing on a list of twenty-two railroad grade crossings requiring federally funded installation of active warning systems, once federal funds became available. *Id.* at 1192. Armijo argued that even though the original determination that the crossbucks were adequate preempted state law, the later decision to upgrade the crossing suspended the preemption of state law. *Id.* We rejected this argument, holding:

> The mere fact that the federal government has changed its opinion regarding what warning devices are needed at a particular crossing at some point after making a prior determination a lesser warning

> system is sufficient is of no real significance: the issue is not what warning system the federal government determines to be necessary, but whether the final authority to decide what warning system is needed has been taken out of the railroad's and the state's hands under 23 C.F.R. § 646.214(b)(3) & (4).

*Id.*; *see also Bock v. St. Louis Sw. Ry. Co.*, 181 F.3d 920, 923 (8th Cir. 1999) ("Preemption is not a water spigot that is turned on and off simply because a later decision is made to upgrade a crossing.").

This result comports with *Shanklin*, which explained even where the crossing presents factors listed in § 646.214(b)(3) and the crossing does not have gates or lights, if the passive warning device had previously been deemed adequate, preemption will still lie. 529 U.S. at 357. The Court explained "[i]t is [the] displacement of state law concerning the devices' adequacy, and not the State's or the FHWA's adherence to the standard set out in §§ 646.214(b)(3) and (4) . . . that pre-empts state tort actions." *Id.* at 357-58. Thus, under FLSA preemption, even if the state should have originally installed different devices or the conditions have "changed such that automatic gates and flashing lights would be appropriate," once state law is preempted, non-compliance with the regulation is immaterial to the issue of preemption. *Id.*

Henning argues even if her inadequate signalization claim is preempted, she may recover under a theory of negligent delay. Specifically, she argues the issue of whether Union Pacific negligently delayed its installation of the new warning device is not preempted because it is divorced from the issue of whether

the design of the crossing was adequate.  In this case, however, Henning's claim

for negligent delay, like inadequate signalization, is also preempted by the FRSA.

*Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 645-46 (5th Cir. 2005).  Although §

646.214(b)(3) requires that automatic gates must be installed once certain criteria

are met, the federal regulation's mandate in § 646.214(b) "usurps state and

private decision-making authority and indicates federal preemption."  *Id.* at 645.

A "negligent delay" claim is "little more than an attempt to make an end run

around the preemption doctrine."  *Bock*, 181 F.3d at 923.  As the Eighth Circuit

explained, a "negligent delay claim is founded on the premise that the then

existing crossbucks inadequately protected the crossing."  *Id.*  Due to preemption,

however, the "railroad was no longer duty-bound, in the tort sense, for causes of

action based on the adequacy of the crossing safety devices."  *Id.*  Because federal

funds were used to install the crossbucks at the Shurley Street crossing, the

district court properly concluded Henning's inadequate signalization and

negligent delay claims were preempted by federal law.

**B.      Clarification Amendment to FRSA Preemption Provision**

Henning next claims that a 2007 clarification amendment to 49 U.S.C.

§ 20106 of the FRSA allows for both her inadequate signalization and negligent

delay claims.  The provision, titled "Clarification Regarding State Law Causes of

Action" states:

(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party--

    (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

    (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

    (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

(2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

49 U.S.C. § 20106(b). The Federal Railroad Administration promulgated regulations memorializing the amendment of § 20106 on April 14, 2008. *See* 49 C.F.R. §§ 217.2 and 218.4.

The impetus for this amendment arose from a train derailment in Minot, North Dakota on January 18, 2002. *See Lundeen v. Canadian Pac. Ry. Co.*, 507 F. Supp. 2d 1006, 1008 (D. Minn. 2007); *Mehl v. Canadian Pac. Ry., Ltd.*, 417 F. Supp. 2d 1104, 1106 (D. N.D. 2006). "Several damaged tanker cars released anhydrous ammonia into the air." *Mehl*, 417 F. Supp. 2d at 1106. At issue in both cases were plaintiffs' allegations that a portion of the continuous-welded-rail track failed, causing the derailment. *Id.*; *Lundeen*, 507 F. Supp. 2d at 1009. The

plaintiffs alleged personal injury and property damages caused by the accident, citing the railroad's failure to inspect and maintain the rail, failure to train the track inspectors, and failures in the operation of the train. *Lundeen*, 507 F. Supp. 2d at 1011; *Mehl*, 417 F. Supp. 2d at 1116-17. Although noting the harsh impact of its rulings, both district courts concluded the FRSA preempted any state law claim, even where the plaintiffs alleged the railroad failed to comply with federal regulations, *Mehl*, 417 F. Supp. 2d at 1116-17, 1120-21, and its own internal policies, *Lundeen*, 507 F. Supp. 2d at 1011-12. Thus, both the *Mehl* and *Lundeen* courts concluded a railroad's violation of federal standards of care was not relevant to the preemption analysis. The court in *Mehl* explicitly asked Congress to intervene. 417 F. Supp. 2d at 1120.

*Mehl* and *Lundeen* brought to light an erroneous interpretation of FRSA preemption not supported by the text of § 20106, *Easterwood*, or *Shanklin*. Thereafter, Congress amended 49 U.S.C. § 20106 by adding the clarification amendment, making clear that when a party alleges a railway *failed to comply* with a federal standard of care established by regulation or with its own plan, rule or standard created pursuant to a federal regulation, preemption will not apply. 49 U.S.C. § 20106(b)(A). Henning argues Union Pacific failed to comply with the federal standard of care by not installing active warning devices, and thus her inadequate signalization and negligent delay claims are not preempted. This argument, however, fails to account for how preemption operates in the context of

§ 646.214(b)(3) and (4).  Unlike the regulations at issue in *Mehl* and *Lundeen*, establishing federal standards of care under which the railroads must affirmatively act, § 646.214(b)(3) and (4) displace railroad decision-making authority.  There is, therefore, no federal standard of care under which Union Pacific could have failed to comply.

It is apparent that § 646.214(b)(3) and (4) do not establish a federal standard of care under which a railroad must act when the regulation is compared to the regulations at issue in the Minot derailing cases.  In *Mehl*, the plaintiffs alleged, *inter alia*, the railroad failed to properly inspect the track and freight cars in violation of 49 C.F.R. §§ 215.11 and 215.13.  *Mehl*, 417 F. Supp. 2d at 1116-17.  These regulations are intended to prevent negligent inspection by setting forth minimum qualifications for inspectors and specifying the particular aspects of freight cars that must be inspected prior to departure.  49 C.F.R. § 215.11(b) (requiring inspectors to meet minimum qualifications); *Id.* § 215.13; 45 Fed. Reg. 26708, 26711 (April 21, 1980) (requiring inspection for imminently hazardous conditions, such as insecure coupling and objects extending from the side of the freight cars).  These regulations place affirmative, ongoing duties on railroad operators to follow the federal safety standards of care.  In contrast, § 646.214(b)(3) and (4) operate in a different fashion.  Instead of setting out a federal standard of care under which railroads must operate, the regulation establishes a paradigm under which "federal funds participate in the installation

of warning devices[] [and] the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection [i.e., through their participation in diagnostic teams]." *See Easterwood*, 507 U.S. at 671; *see also Armijo*, 87 F.3d at 1192. Unlike the regulations or internal policies at issue in *Lundeen* and *Mehl*, the regulations in this case take the "*final authority to decide* what warning system is needed . . . out of the railroad's and the state's hands." *Armijo*, 87 F.3d at 1192. The regulations do not establish a federal standard of care under which Union Pacific must continually act. Thus, Union Pacific could not, as a matter of law, fail to comply with § 646.214(b)(3) and (4).

Henning argues to the extent *Shanklin* held federal preemption applies even where a railroad violates a federal standard or its own plan, it has been overruled. This argument assumes *Shanklin* conflicts with the clarification amendment. As explained above, however, because *Shanklin* analyzed the preemptive effect of § 646.214(b)(3) and (4), which do not establish a federal standard of care for the railroad, there is no conflict. Congress did not overrule *Shanklin*, but instead provided clarification for courts interpreting *Shanklin*, establishing FRSA preemption does not apply when a railroad violates a federal safety standard of care. This interpretation is supported by the legislative history of the clarification amendment. The Conference Report states the "restructuring is not intended to indicate any substantive change in the meaning of the provision." H.R. Rep. No.

110-259, at 351, 120 Cong. Rec. H8589 (2007). The provision was intended to "clarify the intent and interpretations of the *existing preemption statute* and to rectify the Federal court decisions related to the Minot, North Dakota accident that are in conflict with precedent." *Id.* (emphasis added). Further, the amendment is labeled as a "clarification" which indicates Congress sought to resolve an ambiguity rather than effect a substantive change. *See, e.g.*, *Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004) (explaining that Congress often amends laws to "clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases" (quotation omitted)). In this case, Congress explicitly explained it sought to rectify the Minot, North Dakota cases "that are in conflict with precedent." H.R. Rep. No. 110-259, at 351. Had Congress sought to overrule *Shanklin* and *Easterwood*, it would have done so in express terms. *See Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) ("[I]f Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."). The clarification amendment merely rectified the district court's erroneous application of *Shanklin* and *Easterwood* to federal regulations establishing a federal standard of care. Because § 646.214(b)(3) and (4) do not create a federal standard of care, the clarifying amendment is not applicable to this case. Thus, we hold Henning's inadequate signalization and negligent delay claims are preempted by § 646.214(b)(3) and (4).

## III.   MOTION FOR NEW TRIAL

Following the jury verdict, Henning moved for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.  Henning argued the district court committed prejudicial evidentiary errors as well as errors in the jury instructions, warranting a new trial.  Specifically, Henning argued the district court erred by (1) admitting evidence of Shockey's age and that he did not have permission to drive the car; (2) barring the admission of evidence that Union Pacific destroyed dispatcher tapes recorded during and after the accident; (3) excluding evidence that Union Pacific installed lights and gates at the crossing following the accident; and (4) instructing the jury regarding a driver's duty to stop at a railroad crossing and including an instruction on driving a vehicle in a "careless or wanton manner"; and (5) refusing to instruct the jury on spoliation  The district court denied Henning's motion for a new trial.  The court, however, erroneously applied Federal Rule of Civil Procedure 50(b), the rule applicable to a motion for judgment as a matter of law.

Generally, we review the denial of a motion for a new trial for abuse of discretion. *United States v. Gwathney*, 465 F.3d 1133, 1144 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 2151 (2007).  A district court abuses its discretion when it bases its ruling on an erroneous view of the law. *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1289 (10th Cir. 2005).  A new trial cannot be granted unless the error was prejudicial and affects the party's substantial rights.  Fed. R. Civ. P.

-17-

Henning argues by applying Rule 50(b), which required the district court to view the evidence in the light most favorable to Union Pacific, the district court abused its discretion.

We agree the district court applied the wrong standard to Henning's motion for a new trial. In its order denying Henning's motion, the district court only stated the standard for a Rule 50(b) motion. It therefore incorrectly applied a more stringent standard, viewing the evidence in the light most favorable to Union Pacific. A motion for a new trial, however, neither requires nor even envisions that the court view the evidence in such a light. Instead, a new trial may be granted if the district court concludes the "claimed error substantially and adversely" affected the party's rights. *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1297 (10th Cir. 1998). Thus, the district court abused its discretion by applying the wrong legal standard. *United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005) (holding where district court applied the wrong standard in considering motion for new trial it abused its discretion).

Where a district court applies an incorrect standard to a motion for a new trial, we will not remand to the district court for reconsideration under the proper standard if the error was harmless. *See id*. To determine if the district court's error was harmless, we must consider whether the district court would have abused its discretion by granting a new trial. *Id.* If, on appeal, this court would have reversed a grant of a new trial, then the district court's error would not

affect Henning's substantial rights. *Id.* Thus, we must first examine our standard of review when a court grants a new trial and then examine Henning's claims of error for which she sought a new trial.

Like a district court's decision to deny a motion for a new trial, we review the district court's decision to grant a new trial for an abuse of discretion. This court will only reverse if we have "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922 (10th Cir. 1992) (quotations omitted). "We give the trial judge wide latitude with respect to [a] motion for a new trial because he [is] uniquely able to assess the likelihood that the [evidence] was prejudicial." *Id.* Applying this standard, it would have been an impermissible choice and thus an abuse of discretion for the district court to grant a new trial on all but one of Henning's theories. Had the district court chosen to grant a new trial based on Henning's argument that the district court improperly admitted evidence of Shockey's age and his lack of permission to drive, however, it would not have been an abuse of discretion. Thus, we must remand to the district court to reconsider Henning's motion for a new trial using the proper standard.

### A.    Shockey's Age and Lack of Driver's License

At the time of his death, Shockey was fifteen years old. Under Oklahoma law, he was too young to possess a valid driver's license. Okla. Stat. tit. 47,

§ 6-105. On the day of the fatal accident, Shockey was driving his mother's car, although she had not given him permission to do so. Henning filed a motion *in limine* to exclude any evidence that Shockey was fifteen years old and that he did not have a driver's license. The district court granted Henning's motion in part, prohibiting any evidence that Shockey did not have a valid driver's license at the time of the accident. It, however, denied Henning's motion with respect to Shockey's age, finding the evidence was "relevant for multiple purposes, including but not limited to the assessment of damages." Although Union Pacific was prohibited from raising the driver's license issue, on multiple occasions, it elicited testimony that Shockey "had just turned fifteen years old and . . . was not supposed to be driving that car." Henning objected, arguing this evidence was the equivalent of introducing evidence that Shockey did not have valid driver's license. The district court, however, overruled Henning's objections.

The majority rule prohibits introducing evidence relating to whether a party possessed a valid driver's license. *Weaver v. Blake*, 454 F.3d 1087, 1094 (10th Cir. 2006). The rationale for this rule is that "unlike traffic regulations such as speed limits, licensing statutes do not in themselves create a standard of care that a driver is expected to meet while operating a motor vehicle." *Id.* Thus, the lack of a license is not relevant to whether a driver was negligent at the time of the accident. *Id.* Oklahoma appears to follow the majority rule. *Bradley v. Chickasha Cotton Oil Co.*, 84 P.2d 629, 632 (Okla. 1938); *Bennett v. Morris*

-20-

*Farrar Truck Co.*, 520 P.2d 705, 710 (Okla. Civ. App. 1974) (holding the lack of a driver's license does not prove a minor driver's negligence).

Evidence that Shockey was fifteen years old, combined with evidence that he was not permitted to drive the car, is the equivalent of evidence that he did not possess a valid driver's license. In its order denying a new trial, the district court stated "evidence [Shockey] did not have permission to drive the vehicle in question on the day of the accident was relevant to the issue of Shockey's mind set while he was driving across the crossing, a valid piece of evidence for the jury to consider in assessing negligence." We cannot discern any relevance for this piece of evidence and Union Pacific provided none. *See* Fed. R. Evid. 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Whether or not Shockey had permission to drive the car is not itself probative of whether he used due care in driving across the Shurley Street crossing. Further, there were no other issues to which the lack of permission was relevant. The only logical reason Union Pacific sought to introduce this evidence was for the impermissible inference that because Shockey lacked permission to drive, he was negligent.

Had the district court determined a new trial was warranted on these grounds, we could not say it "exceeded the bounds of permissible choice in the

circumstances." *Mayhue*, 969 F.2d at 922. The issue of Shockey's contributory negligence was a central aspect of the trial. Introducing Shockey's age in conjunction with evidence that he lacked permission to drive created the possibility that the jury relied on this impermissible basis to conclude he was negligent. Whether this error affected Henning's substantial rights, and thus warrants a new trial, is a question we leave for the district court to consider on remand under the proper standard. There is record evidence that Shockey was driving over twenty miles an hour when his car collided with the train, a speed inconsistent with stopping at the crossing. Thus, the district court may conclude the jury did not improperly infer negligence from impermissible evidence. Based on the posture of the case, however, this is a determination that must be made by the district court, as it is "uniquely able to assess the likelihood that the [evidence] was prejudicial." *Id.*

**B.  Henning's Remaining Claims of Error**

On appeal, Henning raised several other alleged evidentiary and instructional errors. These errors were raised in the motion for a new trial. Because we conclude it would have been an abuse of discretion to grant a new trial on these grounds, Henning's substantial rights were not affected with respect to these claims. Therefore, on remand, the district court need not revisit these theories for a new trial.

1.      Destruction of Dispatcher Tapes

Union Pacific's claims agent requested the dispatcher tapes from the accident several days following the collision. Although Union Pacific immediately sent what it thought to be the correct tape, it later discovered it had sent a tape from the wrong train dispatching position. By the time the error was discovered, the original tape had been destroyed, pursuant to company policy. Union Pacific filed a motion *in limine* to exclude evidence about any alleged spoliation of the dispatcher tapes. The district court initially denied the motion, stating it had insufficient evidence to determine whether the tapes were relevant and the circumstances surrounding the destruction of the tapes. After Henning submitted additional evidence in support of allowing spoliation evidence and a proposed instruction, the district court ruled that Henning failed to show the tapes were relevant or that their destruction was anything but inadvertent. It therefore ruled Henning could not introduce evidence regarding the missing tapes. Henning asked the court to revisit the issue and sought an adverse inference instruction. The district court denied the motion, finding no evidence of intentional bad faith and refused to give an adverse inference instruction.

Henning provided no evidence showing the tapes contained any relevant evidence. The district court was well within its discretion to exclude irrelevant evidence. *See* Fed. R. Evid. 401. Henning relies heavily on *Stevenson v. United Pacific Railroad Co.*, 354 F.3d 739, 748 (8th Cir. 2004), for the proposition that

dispatcher tapes are "important to any litigation over an accident that resulted in serious injury or death." The Eighth Circuit further stated "a voice tape that is the only contemporaneous recording of conversations at the time of the accident will always be highly relevant to potential litigation over the accident." *Id.* Although *Stevenson* seems to advocate a blanket rule that dispatcher tapes will always be relevant, we decline to follow such a broad determination. Relevance is a highly fact-specific inquiry. *See Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1126 (10th Cir. 2004). Information found on dispatcher tapes may be highly relevant to the issues in one case but irrelevant in another. For example, the tapes may be useful when there is a genuine issue as to the time of an incident but irrelevant in a case such as this where time is not an issue. Union Pacific presented expert testimony that dispatcher tapes would not be helpful regarding the issues in this case. Further, evidence was introduced that most of the communications that day were via cell phone, rather than the radio, and that these conversations would not have been recorded on the tape. Henning did nothing to refute this evidence, and thus the district court did not err in finding the tapes were not relevant.

Henning's claim she was entitled to an adverse inference instruction likewise fails. An adverse inference is a powerful sanction as it "brands one party as a bad actor" and "necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging

information in the unknown contents of an erased audiotape." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 900-01 (8th Cir. 2004). Therefore, courts require evidence of intentional destruction or bad faith before a litigant is entitled to a spoliation instruction. *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997). "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Id.* The district court found Union Pacific's destruction of the tape was "mere negligence." Because this finding was not clear error, we accept the finding. *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007).

Henning argues bad faith is not a requirement to admit spoliation evidence. In other words, Henning submits the jury was entitled to hear about the missing tapes, even if the court did not provide an adverse inference instruction. The court, of course, may impose lesser sanctions absent a finding of bad faith.[6] *See Estate of Trentadue v. United States*, 397 F.3d 840, 862 (10th Cir. 2005) ("The district court has discretion to fashion an appropriate remedy depending on the culpability of the responsible party and whether the evidence was relevant to

---

[6]In *103 Investors I, L.P. v. Square D Co.*, the district court granted the defendant's motion for spoliation sanctions where the plaintiff destroyed all but a small portion of crucial evidence in a failure to warn case. 470 F.3d 985, 988 (10th Cir. 2006). As a sanction, the district court struck the testimony of the plaintiff's witness who testified the destroyed evidence did not contain a warning label. *Id.* Although the defendant did not show bad faith, this court explained bad faith is not required for lesser sanctions, such as excluding evidence. *Id.* at 988-89.

proof of an issue at trial."). "A spoliation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N & Santa Fe Ry. Co.*, 505 F.3d at 1032. Without proving relevance, however, Henning could not show she was prejudiced. Thus, the district court committed no error by refusing to impose a lesser sanction and excluding evidence that Union Pacific inadvertently destroyed the dispatcher tapes.

### 2.      Subsequent Remedial Measures

Union Pacific filed a motion *in limine* to exclude any evidence relating to subsequent remedial measures at the Shurley Street crossing. Federal Rule of Evidence 407 states:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Concluding Union Pacific controverted neither control nor feasibility, the district court granted the motion. It also concluded Henning's offer of evidence that Union Pacific installed lights and gates after the collision as impeachment

evidence was "nothing more than an attempt to circumvent the preempted claim challenging the adequacy of warning devices at the grade crossing."

We agree. First, whether gates and lights would be a safer measure at the crossing is not relevant to any issue in this case. Henning's negligence claim regarding warning devices is preempted. As a matter of law, the crossbucks and stop sign are deemed adequate. Thus, whether another type of warning device would have been safer is irrelevant. Second, the record does not indicate Union Pacific ever controverted control or feasibility. Therefore, the district court properly excluded this evidence.[7]

### 3. Jury Instructions

We review jury instructions de novo, examining whether as a whole, the instructions accurately informed the jury of the issues and the governing law. *United States v. Baker*, 508 F.3d 1321, 1324 (10th Cir. 2007). The decision to give a particular instruction, however, is reviewed for an abuse of discretion. *United States v. Holly*, 488 F.3d 1298, 1302 (10th Cir. 2007), *cert. denied*, 76 U.S.L.W. 3324 (U.S. Apr. 14, 2008) (No. 07-795). Failure to properly instruct

---

[7]Henning also argues she was entitled to present evidence that Union Pacific planned to install lights and gates to impeach statements made by Union Pacific. She incorrectly states that Union Pacific claimed the passive warning device was better than lights and gates. In fact, Union Pacific stated in its opening that a stop sign was better than lights alone, *without a gate*, because a driver was forced to stop. In no way did Union Pacific open the door. Further, we question to what extent Union Pacific could "waive" its preemption if it had, in fact, stated a passive warning system is more effective than an active warning device. That question, however, is not before us.

the jury requires a new trial "if the jury might have based its verdict on the erroneously given instruction." *Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1242 (10th Cir. 2002) (quotation omitted).

The district court instructed the jury it should find Shockey was negligent per se if he violated any one of three statutes: § 11-701, § 11-703, and § 11-901 of title 47 of the Oklahoma Code. Henning objected to these instructions, arguing the evidence did not support the instructions. Specifically, the jury was instructed under § 11-701 that a motorist approaching a grade crossing shall

> stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when: [1] A railroad train approaching within approximately one thousand five hundred feet (1,500) of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard; [2] An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.

Henning argues there was no evidence that the train emitted a signal at 1,500 feet; instead the evidence shows the train did not emit a signal until it was within 1,100 feet of the crossing. She thus suggests Union Pacific violated the statute, abrogating Shockey's duty to stop. This argument flies in the face of the plain language of the statute, placing a duty on a driver to stop when a train is approaching and is sounding a horn *approximately* within 1,500 feet. The evidence clearly supported this instruction and it was proper.

The court instructed the jury, pursuant to § 11-703, that a driver approaching a stop sign has a duty to stop at a clearly marked stop line and, if none exists, then at the point nearest the intersecting roadway where the driver has a view of the approaching traffic, before he enters the intersection. Henning argues there is no evidence that a clearly marked line did not exist and therefore, the instruction was inapplicable. This argument is based on a misreading of § 11-703. It is immaterial whether a clearly marked line existed, as the statute provides instructions on the correct place to stop a vehicle, when approaching a stop sign, in the event there is, or is not, a clearly-marked stop line. Henning also argues § 11-703 conflicts with § 11-701, which requires a driver to stop at least fifteen feet before a rail. These two statutes, however, can easily be read together. A driver has a duty to stop fifteen feet from the rail when a train has sounded its horn or the train is visible. If a train is not visible and no horn is sounded, a driver has a duty under § 11-703 to stop either at the line or at a place where his view is unobstructed. Section 11-701 simply provides a more stringent requirement to stop, regardless of the location of the stop sign, at least fifteen feet before a rail, when a train poses an immediate risk.

The jury was also instructed it should find Shockey was negligent per se if he violated § 11-901, which states "[i]t shall be deemed reckless driving for any person to drive a motor vehicle in a careless or wanton manner without regard for the safety of persons or property." Henning argues there is no evidence of

-29-

reckless driving, other than evidence that he failed to stop at the stop sign, which is encompassed in other instructions. Evidence was introduced that Shockey was driving over twenty miles an hour when his car collided with the train. Further, evidence was introduced that this speed was inconsistent with stopping at the sign and that Shockey's conduct resulted in property damage and loss of life. Oklahoma Highway Patrol Trooper Damon Tucker testified there was no evidence Shockey stopped at the stop sign, but even if he had, he failed to yield to the approaching train. This instruction, therefore, was supported by the evidence and not unduly cumulative. When viewing the jury instructions as a whole, as we must, the jury had a proper understanding of the law. The district court, therefore, made no instructional errors and would have abused its discretion if it had granted a new trial on these grounds.

## IV.  CONCLUSION

For the foregoing reasons, we **affirm** in part, **reverse** in part, and **remand** to the district court to consider Henning's motion for a new trial based on the district court's error in admitting evidence that Shockey did not have permission to drive the car.

06-7034, *Henning v. Union Pacific R.R. Co.*

**BALDOCK**, Circuit Judge, dissenting as to Part III.A.


The Court first decides the district court properly deemed irrelevant evidence that Shockey did not possess a valid driver's licence at the time of his accident. See Court's Op. at 20-21 (citing Oklahoma law). The Court then concludes "[e]vidence that Shockey was fifteen years old, combined with evidence that he was not permitted to drive the car, is the equivalent of evidence that he did not possess a valid driver's license," and, therefore, inadmissible. Id. at 21.[1] The Court

---

[1] On cross-examination, Shockey's mother testified as follows:

> Q. How old was Derek at the time of the accident?
> A. He was 15.
> Q. He had just turned 15 two or three months ago, in June I think, the end of June?
> A. Uh-huh.
> Q. How did he get to school.
> A. School bus.
> Q. All right. Was he familiar with this crossing, ma'am?
> A. Yes, he was.
> Q. Did he – did the school bus use the crossing?
> A. Yes it did.
> Q. And I take it you all drove over it?
> A. Yes.
> Q. Y'all have been over that crossing, I guess, too many times to count?
> A. Yes.
> Q. And I assume you were both aware that trains came through there frequently?
> A. Yes.
> Q. Okay. You had not allowed Derek to drive; is that right?

(continued...)

declares such evidence inadmissible because "[w]hether . . . Shockey had permission to drive the car is not itself probative of whether he used due care in driving across the . . . crossing. . . ." Id. I disagree.

The Court acknowledges "[t]he issue of Shockey's contributory negligence was a central aspect of the trial." Id. at 22. In determining the contributory negligence of a minor, the law in Oklahoma has long been that "factors such as intelligence, experience, discretion, previous training, maturity, alertness, and the nature of the danger encountered . . . are to be taken into consideration as well as the age of the child." Davis v. Bailey, 19 P.2d 147, 148 (Okla. 1933). Of course, Union Pacific sought to introduce Shockey's lack of permission to drive to create an inference that he exercised something less than due care in operating his vehicle. See Larson v. Solbakken, 221 Cal. App. 2d 410, 420 (1963) ("[D]efendant's mental attitude and knowledge of the probable consequences of the manner in which he was operating his automobile prior to or contemporaneously with the accident were proper subjects of inquiry."). Evidence of Shockey's maturity and experience, as well as the testimony that Shockey's mother told him "not to be driving" (for

---

[1](...continued)
        A.     No, I didn't.
        Q.     Did you forbid him to drive?
        A.     Yes, I told him not to be driving.
        Q.     So, his driving that car that day was against your
                  strict instructions; isn't that true, ma'am?
        A.     Yes.
Appellant's App. at 2106.

whatever reason), bore upon his state of mind at the time of the accident and were undoubtedly relevant to apportioning responsibility in this case. "[T]he mandate of comparative responsibility is that the fact finder should roughly compare the relative responsibility of all actors who contributed to an injury. It is difficult to perform that task without taking into account evidence that reflects on each actor's culpability." Restatement (Third) of Torts: Apportionment of Liability § 8, at 90 (2000) (Reporters' Note) (hereinafter Restatement).

Section 8 of the Restatement provides that "the nature of the person's risk-creating conduct, including any awareness or indifference with respect to the risks created by the conduct" is material to allocating responsibility among the parties. Comment c to § 8 explains that the nature of a party's risk creating conduct encompasses "each person's awareness, intent, or indifference with respect to the risks." Id. § 8 cmt. c. Comment c concludes that factors bearing upon a party's state of mind at the time of the accident "may be considered for apportioning responsibility *even if they are not themselves causally connected to the plaintiff's injury*, as long as the risk-creating conduct to which they refer is causally connected to the injury." Id. (emphasis added).

Evidence that Shockey's mother told him not to drive and that he *knew* he lacked permission to do so certainly bear on the risk Shockey undertook in disobeying her. And clearly that risk-creating conduct, *i.e.*, Shockey's unauthorized driving, is causally connected to the accident, thereby rendering evidence as to his

state of mind relevant and admissible under Fed. R. Evid. 401. While the admissibility of such evidence might be challenged as unduly prejudicial under Fed. R. Evid. 403, that question is not before us. Accordingly, I would affirm the judgment of the district court in all respects.